FILED

ERIC H. HOLDER, JR.
Attorney General
THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division
STEVEN H. ROSENBAUM
Chief
DONNA M. MURPHY
Principal Deputy Chief
PATRICIA L. O'BEIRNE
E-mail: Patricia.O'Beirne@usdoj.gov
BURTIS M. DOUGHERTY
E-mail: Burtis.M.Dougherty@usdoj.gov
DANIEL P. MOSTELLER
E-mail: Daniel.Mosteller@usdoj.gov
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - G Street
Washington, DC 20530
Tel: (202) 514-4713
Fax: (202) 514-1116

ANDRÉ BIROTTE JR.
United States Attorney
LEON W. WEIDMAN
Chief, Civil Division
SEKRET SNEED
Assistant United States Attorney
Calif. Bar No. 217193
E-mail: Sekret.Sneed@usdoj.gov
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, CA 90012
Tel: (213) 894-3551
Fax: (213) 894-7819
Attorneys for Plaintiff
United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

COUNTRYWIDE FINANCIAL
CORPORATION; COUNTRYWIDE
HOME LOANS, INC; COUNTRYWIDE
BANK,

    Defendants.

CIVIL NO.: CV11 10540-PSG (AJWx)

COMPLAINT

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

2011 DEC 21   AM 11:11

BY _____

Plaintiff, United States of America, alleges:

## **INTRODUCTION**

1. The United States brings this action against Countrywide Financial Corporation, acting through its various divisions and subsidiaries (collectively, "Countrywide") for discriminating against more than 200,000 Hispanic and African-American borrowers in its residential mortgage lending. The action to enforce the Fair Housing Act, 42 U.S.C. §§ 3601-3619 ("FHA"), and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f ("ECOA"), is brought to redress the discrimination based on race and national origin that Countrywide engaged in from 2004 to 2008 during the mortgage boom.

2. Countrywide was one of the largest single-family mortgage lenders in the United States, if not the largest, between 2004 and 2008. During that period, Countrywide originated over 4.4 million residential mortgage loans through its retail loan offices and its wholesale division using mortgage brokers. Between 2004 and 2007, the total annual volume of these loans ranged between $110 billion and $243 billion. During that four-year period, Countrywide reported total net earnings of approximately $6.7 billion. Part of Countrywide's business strategy was to target local Hispanic and African-American markets in order to expand its lending and ultimately gain market dominance in making residential loans in those communities.

3. As a result of Countrywide's policies and practices, more than 200,000 Hispanic and African-American borrowers paid Countrywide higher loan fees and costs for their home mortgages than non-Hispanic White borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin.

4. Additionally, as a result of Countrywide's policies and practices, Hispanic and African-American borrowers were placed into subprime loans when similarly-

1  qualified non-Hispanic White borrowers received prime loans.  Between 2004 and
2  2007, more than 10,000 Hispanic and African-American wholesale borrowers
3  received subprime loans, with adverse terms and conditions such as high interest
4  rates, excessive fees, prepayment penalties, and unavoidable future payment hikes,
5  rather than prime loans from Countrywide, not based on their creditworthiness or
6  other objective criteria related to borrower risk, but because of their race or
7  national origin.

8  5.    The victims of Countrywide's discrimination were located in more than 180
9  geographic markets across at least 41 states and the District of Columbia.  For
10 example, the statistical analyses discussed below found high numbers of potential
11 victims in metropolitan markets throughout the country.  The top twenty markets
12 with the highest number of victims are: Los Angeles;  Riverside; Chicago;
13 Houston; Miami; Atlanta; New York; Washington, DC; Phoenix; San Diego; Las
14 Vegas; Fort Lauderdale; Orlando; Santa Ana; Dallas; Denver; Oxnard; Newark;
15 Long Island; and  Detroit.  More than two-thirds of the victims of Countrywide's
16 discrimination are Hispanic, and nearly one-third of all Countrywide's
17 discrimination victims were located in California.

18 6.    Countrywide's home mortgage lending policies allowed its employees and
19 mortgage brokers both to set the loan prices charged to borrowers and to place
20 borrowers into loan products in ways that were not connected to a borrower's
21 creditworthiness or other objective criteria related to borrower risk.
22 Countrywide's policies created financial incentives for its employees and
23 mortgage brokers by sharing increased revenues with them.

24 7.    Countrywide knew or had reason to know based on its own internal monitoring
25 and reporting that its policies of giving unguided discretion to its own loan officers
26 as well as to brokers was resulting in discrimination.  Countrywide did not act to
27 adequately compensate borrowers who were victims of discrimination nor did it
28

- 3 -

take effective action to change the discriminatory policies or practices to eliminate the discrimination.

8. The higher borrowing costs Countrywide charged to hundreds of thousands of Hispanic and African-American families – whether paid as higher up-front fees, higher interest rates, prepayment penalties, or otherwise – put increased economic burdens on those families. For the Hispanic and African-American families Countrywide placed in subprime loans when those same families could have received prime loans, the economic burdens and risks, including the increased risk of delinquency or foreclosure, were particularly high. A recent survey of large national lenders by the Office of the Comptroller of the Currency reported that as of June 30, 2011, 28.1% of subprime loans nationwide are seriously delinquent or in foreclosure compared to only 5.5% of prime loans. Similarly, as of the second quarter of 2011, Bank of America reported that of the residential loans it services, approximately 74% of which were originated by Countrywide, about 33% of its subprime loans were seriously delinquent or in foreclosure compared to about 10% of its prime loans.

9. In addition, Countrywide engaged in discrimination on the basis of marital status by encouraging married borrowers applying for credit in one spouse's name to have their non-applicant spouses give up all their rights and interests in the property securing the loan at the time the loans were originated.

10. The United States brings this lawsuit to hold Countrywide accountable for its serious violations of law and remedy the substantial and widespread harmful consequences of Countrywide's discriminatory lending policies and practices.

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345, 42 U.S.C. § 3614, and 15 U.S.C. § 1691e(h). Venue is appropriate pursuant to 28 U.S.C. § 1391(b) and (c).

**PARTIES**

12.   During the period of time relevant to the events at issue in this Complaint through July 1, 2008, Defendant Countrywide Financial Corporation ("CFC") was a Delaware-incorporated financial holding company or savings and loan holding company with its principal business office in Calabasas, California. CFC created, authorized, and/or ratified the lending-related policies and practices at issue in this Complaint that its divisions and subsidiaries implemented.

13.   On July 1, 2008, Bank of America Corporation ("BAC"), a Delaware-incorporated financial holding company, acquired ownership of CFC, including all of its subsidiary business entities. Since that acquisition, CFC has remained a Delaware-incorporated company with its principal business office in Calabasas, California, as a direct, wholly-owned subsidiary of BAC.

14.   Defendant Countrywide Home Loans, Inc. ("CHL") is a New York-incorporated wholly-owned subsidiary of CFC with its principal business office in Calabasas, California. Prior to 2008, CHL funded the majority of CFC's nationwide residential mortgage loan origination activity. For the loans it funded under the Countrywide name, CHL was the named lender on the promissory notes for those loans. CHL became a wholly-owned indirect subsidiary of BAC on or about July 1, 2008, as a result of BAC's acquisition of CFC.

15.   Countrywide Bank ("CWB") was originally chartered as a national bank subject to supervision by the Office of the Comptroller of the Currency, and was a subsidiary of financial holding company CFC. CWB was headquartered in Alexandria, Virginia, until February, 2009. As a financial holding company, CFC, together with its subsidiary CHL, was supervised by the Board of Governors of the Federal Reserve System. On or about March 12, 2007, CWB changed its charter to that of a federal savings association, and CFC became a savings and loan holding company. Those changes caused CWB, CFC, and CHL to become subject to supervision by the Office of Thrift Supervision.

16. During 2006, CFC began the process of transitioning the funding of its residential loan originations from CHL to CWB. For those loans funded through CWB under the Countrywide name, CWB was the named lender on the promissory notes for those loans. As of January 1, 2008, CWB funded substantially all nationwide residential loan origination activity using the Countrywide name. For those loans funded by either CHL or CWB, CFC used the same loan origination policies and procedures that it had created, authorized, or ratified, and the same employees and mortgage brokers. Throughout this Complaint, CFC, CWB, and CHL are referred to collectively as "Countrywide."

17. Even after BAC's purchase of CFC on July 1, 2008, CWB continued its banking and mortgage lending operations as a direct subsidiary of CFC, using the same loan origination policies and procedures, until approximately November 7, 2008. At that time, BAC engaged in a series of corporate transactions that ended CWB's status as a subsidiary of CFC and made CWB a direct subsidiary of BAC.

18. On April 23, 2009, the Office of the Comptroller of the Currency approved CWB's request to convert its charter back to that of a national bank and the request by Bank of America, N.A. to then immediately acquire CWB by merger. These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist. Bank of America, N.A. was the surviving institution resulting from this merger. Thus, Bank of America, N.A. is the successor in interest to CWB.

19. The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA and the ECOA and the regulations promulgated under each of those laws. The FHA prohibits financial institutions from discriminating on the basis of, inter alia, race, color, or national origin in their residential real estate-related lending transactions. The ECOA prohibits financial institutions from discriminating on the basis of, inter alia, race, color,

1    national origin, or marital status with respect to any aspect of a credit transaction

2    in carrying out their lending activities.

3    20.    The Defendants in this action are or were creditors within the meaning of the

4    ECOA, 15 U.S.C. § 1691a(e), and are or were businesses that engage in residential

5    real estate-related transactions within the meaning of the FHA, 42 U.S.C. § 3605.

6

7    **REFERRALS FROM BANK REGULATORY AGENCIES**

8    21.    In 2006, Federal Reserve System Examiners initiated a fair lending review of

9    CHL's mortgage pricing practices.  As a result of that review, the Federal Reserve

10   Board ("FRB") determined that it had "reason to believe that Countrywide Home

11   Loans engaged in a pattern or practice of discrimination based on race and

12   ethnicity in violation of Section 701(a) of the Equal Credit Opportunity Act and

13   the Fair Housing Act."

14   22.    Following its determination described in Paragraph 21, and pursuant to 15 U.S.C.

15   § 1691e(g), the FRB referred the matter to the Department of Justice on March 5,

16   2007.  Through a series of tolling agreements, Countrywide "agree[d] to a

17   suspension of the running of any applicable statute of limitations for any cause of

18   action that could be brought against Countrywide pursuant to that referral from the

19   Federal Reserve Board" from March 22, 2007, through December 22, 2011.

20   23.    In early 2008, the Office of Thrift Supervision ("OTS") conducted an examination

21   of the operations of Countrywide, including its compliance with applicable fair

22   lending laws and regulations.  As a result of that examination, the OTS determined

23   that it had "a 'reason to believe' that Countrywide has displayed a 'pattern or

24   practice' of discriminating against minority loan applicants in the pricing of home

25   loans and against married couples concerning the terms and condition of home

26   loans."

27   24.    Following its determination described in Paragraph 23, and pursuant to 15 U.S.C.

28   § 1691e(g), the OTS referred the matter to the Department of Justice on June 27,

1   2008.  Through a series of tolling agreements, Countrywide "agree[d] to a

2   suspension of the running of any applicable statute of limitations under the ECOA

3   for any cause of action that could be brought against Countrywide pursuant to that

4   referral from the Office of Thrift Supervision" from July 1, 2009, through

5   December 22, 2011.

6   25.   Based on the Federal Reserve and OTS referrals, the Department of Justice has

7   engaged since 2007 in an investigation of Countrywide's lending policies,

8   practices, and procedures, including reviewing internal company documents and

9   non-public loan-level data on more than 2.5 million Countrywide loans originated

10  between 2004 and 2008.

11

12                              **FACTUAL ALLEGATIONS**

13  26.   Between January 2004 and December 2008, Countrywide originated residential

14  loans nationwide through both a retail channel and a wholesale channel.

15  27.   Between 2004 and 2008, Countrywide's retail and wholesale divisions operated in

16  virtually all geographical markets in the United States, including several hundred

17  metropolitan areas ("MSAs") as well as the less-populated areas of each state

18  outside of MSAs.

19  28.   Between at least January 2004 and August 2007, Countrywide originated virtually

20  every type of loan product that was available in the residential lending market,

21  several hundred products in all.  These products included: (a) traditional prime

22  loans; (b) subprime loans, typically designed for borrowers with credit scores or

23  other credit characteristics deemed too weak to qualify for prime loans; and (c)

24  "Alt-A" loans, those with application requirements or payment terms less

25  restrictive than traditional prime loan terms or requirements, such as interest-only

26  or negative amortization terms, reduced documentation requirements, or balloon

27  payments.  Subsequent to origination, Countrywide sold or securitized for sale the

28  bulk of the loans it originated in the secondary market, either to government-

1  sponsored entities Fannie Mae and Freddie Mac or to private investors.  Changes
2  in the loan securitization market in 2007 caused Countrywide to focus almost
3  exclusively on prime loans after August 2007 and continuing into 2008.  For the
4  purposes of this Complaint, the term "subprime loans" includes any residential
5  loan product that Countrywide originated and internally designated as subprime by
6  including the label "B/C" in the product name.  For the purposes of this
7  Complaint, the term "non-subprime loans" includes any residential loan product
8  that Countrywide originated and did not internally designate as subprime.  For the
9  purposes of this Complaint, the term "prime loans" includes any "non-subprime
10 loans" that Countrywide originated that (a) required each monthly payment to
11 include interest and a fully amortizing amount of principal and (b) did not
12 categorically allow for reduced documentation of borrowers' income and assets in
13 the underwriting process.

**Retail Lending Pricing**

14
15 29.  Between 2004 and 2008, Countrywide charged more than 100,000 Hispanic and
16 African-American borrowers higher fees and costs than non-Hispanic White retail
17 borrowers not based on their creditworthiness or other objective criteria related to
18 borrower risk, but because of their race or national origin.  It was Countrywide's
19 business practice to allow its employees who originated loans through its retail
20 channel to vary a loan's interest rate and other fees from the price initially set
21 based on a borrower's objective credit-related factors.  This subjective and
22 unguided pricing discretion resulted in Hispanic and African-American borrowers
23 paying more not based on borrower risk than non-Hispanic White borrowers both
24 on a nationwide basis and in dozens of geographic markets across the country
25 where Countrywide originated a large volume of loans.  As a result of
26 Countrywide's discriminatory retail pricing practices, an Hispanic or African-
27 American borrower paid, on average, hundreds of dollars more for a Countrywide
28 loan.

30.   Countrywide's retail pricing monitoring efforts, while inadequate to remedy discriminatory practices against African-American borrowers through 2007 and against Hispanics through 2008, were sufficient to put it on notice of widespread pricing disparities based on race and national origin. Even when Countrywide had reason to know there were disparities, however, Countrywide did not act to determine the full scope of these retail pricing disparities, nor did it take prompt and effective action to eliminate those disparities. Between at least January 2004 and December 2008, Countrywide had a policy or practice of periodically monitoring the pricing of retail home mortgage loans for disparities based on race or national origin at both the branch office and geographic market level. All of Countrywide's monitoring for disparities occurred subsequent to the loan origination, and Countrywide did not reimburse any retail borrowers who were found to have been charged higher loan prices until 2007, when it was required by its regulator to provide some restitution payments. Even then, Countrywide made only a small number of restitution payments.

31.   Countrywide's retail channel consisted of two primary divisions. The larger, the Consumer Markets Division ("CMD"), originated Countrywide's non-subprime residential loan products. From 2004 through 2007, CMD had branches in 48 states and the District of Columbia, with the number of branches ranging between 577 and 773, along with 4 to 5 call centers. These CMD branches and call centers originated loans to borrowers from across the United States. Countrywide employed retail loan officers and other employees at each CMD branch and call center to solicit applications for and originate residential loans to individual loan applicants.

32.   Beginning prior to January 2004 and continuing at least until December 2008, Countrywide utilized a two-tier decision-making process to set the interest rates and other terms and conditions of retail loans it originated. The first step involved setting the credit risk-based prices on a daily basis for Countrywide's various

- 10 -

home mortgage loan products, including interest rates, loan origination fees, and discount points. In this step, Countrywide accounted for numerous objective credit-related characteristics of applicants by setting a variety of prices for each of the different loan products that reflected its assessment of individual applicant creditworthiness, as well as the current market rate of interest and the price it could obtain from the sale of such a loan to investors. These prices, referred to as par or base prices, were communicated through rate sheets, which were available electronically to its retail mortgage loan officers and other retail lending employees. Individual loan applicants did not have access to these rate sheets.

33. As the second step in determining the final price it would charge an applicant for a loan, Countrywide allowed its retail mortgage loan officers, and other employees who participated in the loan origination process, to increase the loan price charged to borrowers over the rate sheet prices set by Countrywide, up to certain caps; this pricing increase was labeled an overage. Countrywide also allowed these same employees to decrease the loan price charged to borrowers below the stated rate sheet prices; this pricing decrease was labeled a shortage. Countrywide further allowed those employees to alter the standard fees it charged in connection with processing a loan application and the standard allocation of closing costs between Countrywide and the borrower. Employees made these pricing adjustments in a subjective manner, unrelated to factors associated with an individual applicant's credit risk. Countrywide provided no written guidance to its retail loan officers or other employees about the criteria they should consider in adjusting risk-based prices during the time period at issue. It did not establish an operational system for the documentation and supervisory review of their adjustments prior to loan origination.

34. During the time period at issue, Countrywide loan officer compensation was affected by the loan officers' decisions with respect to pricing overages and shortages, as well as other factors, such as volume of loans originated. Loan

1    officers could obtain increased compensation for overages and could have their

2    total compensation potentially decreased for shortages.  Countrywide's

3    compensation policy thus provided an incentive for its loan officers in making

4    pricing adjustments to maximize overages and, when offering shortages, to

5    minimize their amount.

6    35.    Countrywide regularly calculated a Net Pricing Exception ("NPE") for each retail

7    loan it funded, subsequent to origination.  The NPE approximates the amount,

8    positive or negative, by which the total cost of a loan to a borrower differs from

9    the total cost of that loan had it closed at the rate sheet price, with the borrower's

10   payment of standard fees and with the standard allocation of closing costs between

11   the borrower and Countrywide.  A positive NPE was an overage, and a negative

12   NPE was a shortage.  Charging overages raised the total cost of loans to borrowers

13   above what they would have paid if the loans had closed based on the rate sheet

14   risk-based price and with the payment of standard fees and the standard allocation

15   of closing costs.  Charging shortages lowered the total cost of loans to borrowers

16   below what they would have paid if the loans had closed based on the rate sheet

17   risk-based price and with payment of standard fees and the standard allocation of

18   closing costs.  Closing a loan with a shortage did not mean that Countrywide or

19   the loan officer lost money on the transaction, only that they earned less profit

20   than they would have absent the shortage.

21   36.    During the time period at issue, Countrywide established par prices for its loan

22   products that were often above competitors' prices for those loan products for

23   borrowers with specified credit qualifications.  The majority of Countrywide's

24   retail borrowers received shortages between 2004 and 2008; as a result, when

25   calculated for all borrowers, the average NPE charged each year during that period

26   was negative.  By regularly setting par prices above competitors' prices,

27   Countrywide further encouraged the exercise of subjective pricing adjustments by

28   its loan officers and other employees.

37. For each residential loan that Countrywide retail mortgage loan officers originated, information about each borrower's race and national origin and the amount of overage or shortage paid was available to, and was known by, Countrywide. Countrywide was required to collect, maintain, and report data with respect to certain loan terms and borrower information for residential loans, including the race and national origin of each retail home loan borrower, pursuant to the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. § 2803.

38. Statistical analyses of data kept by Countrywide on retail loans originated by Countrywide's CMD between January 2004 and December 2008 demonstrate statistically significant[1] discriminatory pricing disparities in retail loans based on both race (African-American) and national origin (Hispanic). These disparities existed both at the national level and in numerous geographic markets across the country.

39. Measured on a nationwide basis by NPE, in each year between 2004 and 2008, Countrywide charged Hispanic borrowers whom Countrywide determined had the credit characteristics to qualify for a home mortgage loan more in pricing adjustments not based on borrower risk for retail CMD loans than non-Hispanic White borrowers. The annual NPE disparities ranged between approximately 15 and 28 basis points, and they are statistically significant.[2] During this period, Countrywide's CMD originated more than 210,000 retail loans to Hispanic borrowers.

---

[1] Statistical significance is a measure of probability that an observed outcome would not have occurred by chance. As used in this Complaint, an outcome is statistically significant if the probability that it could have occurred by chance is less than 5%.

[2] A basis point is a percentage of the total amount of a loan, with one hundred basis points equaling one percent of the loan amount.

40    Measured on a nationwide basis by NPE, in each year between 2004 and 2007, Countrywide charged African-American borrowers whom Countrywide determined had the credit characteristics to qualify for a home mortgage loan more in pricing adjustments not based on borrower risk for retail CMD loans than non-Hispanic White borrowers.  The annual NPE disparities ranged between approximately 13 and 24 basis points, and they are statistically significant.  During this period, Countrywide's CMD originated more than 90,000 retail loans to African-American borrowers.

41.   In approximately 54% of its high loan-volume markets in 2004 (79 of 147), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where CMD made more than 300 total loans and 30 or more loans to Hispanic borrowers in a given year, Countrywide charged Hispanic borrowers more in pricing adjustments not based on borrower risk for retail CMD loans, as measured by NPE, than non-Hispanic White borrowers by a statistically significantly amount.  In 2005, approximately 56% of such markets (81 of 145); in 2006, 50% of such markets (70 of 140); in 2007, 40% of such markets (60 of 150); and in 2008, approximately 33% of such markets (41 of 126) showed statistically significant NPE disparities disfavoring Hispanic retail borrowers.  The disparities in pricing adjustments not based on borrower risk resulted in Hispanic borrowers in these markets paying between approximately 6 and 107 basis points more than non-Hispanic White borrowers for retail CMD loans in a given year.  Between 2004 and 2008, the number of these markets in which Countrywide charged non-Hispanic White borrowers statistically significantly higher NPEs for retail CMD

1   loans than Hispanic borrowers in a given year ranged only between 1 and 3, or 1%

2   to 2% of the high loan-volume markets. [3]

3   42.   In approximately 61% of its high loan-volume markets in 2004 (78 of 128),

4       defined for purposes of this paragraph as those MSAs and non-MSA areas in each

5       state where CMD made more than 300 total loans and 30 or more loans to

6       African-American borrowers in a given year, Countrywide charged African-

7       American borrowers more in pricing adjustments not based on borrower risk for

8       retail CMD loans, as measured by NPE, than non-Hispanic White borrowers by a

9       statistically significantly amount.  In 2005, approximately 65% of such markets

10      (74 of 114); in 2006, approximately 60% of such markets (68 of 114); and in

11      2007, approximately 32% of such markets (42 of 133) showed statistically

12      significant NPE disparities disfavoring African-American retail borrowers.  The

13      disparities in pricing adjustments not based on borrower risk resulted in African-

14      American borrowers in these markets paying between approximately 8 and 71

15      basis points more than non-Hispanic White borrowers for retail CMD loans in a

16      given year.  In all four years, there were no high loan-volume markets in which

17      Countrywide charged non-Hispanic White borrowers statistically significantly

18      higher NPEs for retail CMD loans than African-American borrowers in a given

19      year.

20   43.   These NPE disparities mean, for example, that Countrywide in 2007 charged a

21      retail CMD customer in Chicago borrowing $200,000 an average of about $795

22      more in pricing adjustments not based on borrower risk if he were Hispanic, and

23   _____

24

25   [3]   The inclusion throughout this Complaint of statistical analyses for high-volume
     markets is intended only to provide examples of Countrywide's violation of lending
26   discrimination laws.  The United States' allegations that Countrywide violated lending
     discrimination laws are not limited to these high-volume markets.
27

28

1    an average of about $460 more if he were African-American, than the average

2    amount charged to a non-Hispanic White borrower.  In 2007, Countrywide

3    charged Hispanic and African-American retail CMD customers in Los Angeles

4    borrowing $200,000 approximately $545 and $415, respectively, higher than the

5    average amount Countrywide charged in pricing adjustments not based on

6    borrower risk to a non-Hispanic White borrower.

7  44.    In setting the terms and conditions for its retail loans, including interest rates,

8    Countrywide accounted for individual borrowers' differences in credit risk

9    characteristics by setting the prices shown on its rate sheets for each loan product

10   that include its assessment of applicant creditworthiness as explained in Paragraph

11   32.  Countrywide's loan officers' deviations from the rate sheet prices, as

12   measured by NPE, were separate from and not controlled by the credit risk

13   adjustments already reflected in the rate sheet prices.  Accordingly, the race and

14   national origin NPE disparities described in Paragraphs 39-42 are not adjusted for

15   borrowers' credit risk characteristics.

16  45.    No Countrywide policy directed its retail lending employees to consider a

17   borrower's credit risk characteristics for a second time, after they had already been

18   considered in setting the par price, in determining a pricing overage or shortage on

19   a loan.  Nevertheless, statistical regression analyses of the Countrywide NPEs that

20   control for credit risk factors such as credit score, loan amount, loan-to-value ratio,

21   debt-to-income ratio, and others, demonstrate a similar pattern of race and national

22   origin pricing disparities, with the magnitude only somewhat diminished from the

23   disparities described in Paragraphs 39-42.  Thus, accounting for borrower credit

24   risk factors a second time does not explain the race and national origin disparities,

25   even if those factors were relevant to the subjective pricing adjustments measured

26   by NPE.

27  46.    The statistically significant race and national origin-based disparities in NPEs

28   described in Paragraphs 39-42 for Hispanic and African-American borrowers who

1    Countrywide determined had the credit characteristics to qualify for a home

2    mortgage loan resulted from the implementation and interaction of Countrywide's

3    policies and practices that: (a) routinely allowed or encouraged the use of

4    subjective and unguided pricing adjustments not based on borrower risk by its own

5    employees in setting pricing overages and shortages after par rates had been

6    established by reference to credit risk and loan characteristics and then including

7    those overages and shortages in the terms and conditions of loans Countrywide

8    originated; (b) did not require its employees to justify or document the reasons for

9    pricing adjustments not based on borrower risk; (c) failed to adequately monitor

10   for and fully remedy the effects of racial and national origin disparities in those

11   pricing adjustments; and (d) linked loan officer compensation in part to the

12   charging of overages and shortages.  NPE specifically measures the pricing

13   variation caused by the subjective and unguided pricing adjustments not based on

14   borrower risk.  Countrywide continued to use this non-risk-based component of its

15   overall retail loan pricing policy, to inadequately document and review the

16   implementation of that pricing component, and to link loan officer compensation

17   to overages and shortages through at least the end of 2008.

18   47.  Countrywide's policies and practices identified in Paragraph 46 were not justified

19        by business necessity or legitimate business interests.  There were less

20        discriminatory alternatives available to Countrywide than these policies or

21        practices.

22   48.  Countrywide had knowledge that the unguided and subjective discretion it granted

23        to loan officers and other CMD employees in its retail loan pricing policies and

24        practices was being exercised in a manner that discriminated against Hispanic and

25        African-American borrowers, but continued to implement its policies and practices

26        with that knowledge.  Countrywide did not take effective action to change the

27        pricing adjustment policies and practices to eliminate fully their discriminatory

28        impact, nor did it change its compensation policy to discourage the charging of

- 17 -

1    overages or shortages.  It did not act to identify or compensate any individual

2    borrowers who were victims of its discriminatory retail loan pricing policies and

3    practices until it was required to do so by its regulator in 2007, and then it only

4    identified or compensated a small portion of the victims.

5                    **Wholesale Lending Mortgage Broker Fees**

6    49.   Between 2004 and 2008, Countrywide charged more than 100,000 Hispanic and

7          African-American wholesale borrowers higher fees and costs than non-Hispanic

8          White wholesale borrowers not based on their creditworthiness or other objective

9          criteria related to borrower risk, but because of their race or national origin.  It was

10         Countrywide's business practice to allow its mortgage brokers who generated loan

11         applications through its wholesale channel to vary a loan's interest rate and other

12         fees from the price set based on a borrower's objective credit-related factors.  This

13         subjective and unguided pricing discretion resulted in Hispanic and African-

14         American borrowers paying more not based on borrower risk than non-Hispanic

15         White borrowers both on a nationwide basis and in dozens of geographic markets

16         across the country where Countrywide originated a large volume of loans.  As a

17         result of Countrywide's discriminatory practices, an Hispanic or African-

18         American borrower paid, on average, hundreds of dollars more for a Countrywide

19         loan.

20    50.   Countrywide's wholesale pricing monitoring efforts, while inadequate to remedy

21          discriminatory practices against Hispanic and African-American borrowers

22          through 2008, were sufficient to put it on notice of widespread pricing disparities

23          based on race and national origin.  Even when Countrywide had reason to know

24          there were disparities, however, Countrywide did not act to determine the full

25          scope of these wholesale pricing disparities, nor did it take prompt and effective

26          action to eliminate those disparities.  Between at least January 2004 and December

27          2008, Countrywide had a policy or practice of periodically monitoring in a limited

28          manner the pricing of wholesale home mortgage loans for discrimination based on

- 18 -

race or national origin at the geographic market level and for some individual brokers. However, Countrywide's monitoring for racial and national origin disparities in its wholesale loans was inadequate. For example, the monitoring only occurred long after loan origination; at the individual broker level, it was limited to those brokers with very large pricing disparities that operated only in geographic markets that were first determined to have large pricing disparities; and the monitoring ignored aggregate broker pricing disparities. In addition, when Countrywide found wholesale borrowers who had been discriminatorily charged higher loan prices, Countrywide did not reimburse any of those borrowers for its discriminatory acts until 2008, when it was required by its regulator to provide some restitution payments. Even then, Countrywide made only a small number of restitution payments.

51.   Prior to January 2004 and continuing at least until December 2008, Countrywide originated and funded residential loans of all types, including both subprime and non-subprime loans, through its Wholesale Lending Division ("WLD"). Applications for these loans were brought to Countrywide during those years by mortgage brokers throughout the United States who had entered into contracts with Countrywide for the purpose of bringing loan applications to it for origination and funding.

52.   Countrywide's relationship with the mortgage brokers who brought loans to it was governed throughout the time period at issue by its standard Wholesale Broker Agreement ("WBA"). The WBA, while revised from time to time, consistently contained extensive provisions (a) mandating that a broker act in compliance with all Countrywide policies, (b) requiring submission to Countrywide of the full details of all compensation a broker received for each Countrywide loan, (c) specifying that the decision whether to fund a loan application was Countrywide's alone, and (d) permitting Countrywide to obtain any information with respect to a broker's business operations.

53.   Countrywide was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Countrywide approved and originated.  Countrywide employed wholesale account executives who worked with mortgage brokers in submitting loan applications to Countrywide, and it employed underwriters to determine whether and on what terms to approve and fund wholesale loan applications.  At the time of originating each loan, Countrywide was fully informed of those terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

54.   Prior to January 2004 and until December 2008, Countrywide set terms and conditions, including interest rates, on a daily basis for its various home mortgage loan products available through its wholesale loan channel.  Countrywide accounted for numerous applicant credit risk characteristics by setting a range of prices for each of the different loan products it offered that reflected applicant creditworthiness.  It communicated these loan product prices to its brokers through rate sheets updated daily.  Countrywide gave brokers who signed its standard WBA access to a non-public website where they could obtain the applicable terms and conditions for its various loan products, including rate sheets.  Mortgage loan brokers who were part of Countrywide's network used these rate sheets to assist them in determining the interest rate, points, and fees they would include on completed individual residential loan applications they submitted to Countrywide for approval, origination, and funding.  Individual loan applicants did not have access to these rate sheets.

55.   Under its WBA, Countrywide authorized brokers to inform prospective borrowers of the terms and conditions under which a Countrywide residential loan product was available.  Countrywide did not require the mortgage brokers to inform a prospective borrower of all available loan products for which he or she qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan

- 20 -

1    products best designed to serve the interests expressed by the applicant.  The

2    brokers were also responsible for preparing each loan application and supporting

3    documentation on form documents provided by Countrywide, in accordance with

4    Countrywide's policies and procedures in effect at the time.

5    56.   Upon receipt of a completed loan application from a broker, Countrywide

6    evaluated the proposed loan using Countrywide's underwriting guidelines and

7    determined whether to originate and fund the loan.  The WBA provided that

8    "Countrywide shall have no obligation to fund any Loan submitted to it by Broker

9    and may reject any Loan that, in Countrywide's sole discretion, does not meet the

10   applicable underwriting guidelines."  In the event that Countrywide rejected a loan

11   application or proposed a counteroffer, the WBA provided that Countrywide

12   would prepare the notice of adverse action that ECOA requires the creditor to

13   prepare.  The WBA also provided for each loan approved by Countrywide for

14   funding to be closed in the name of Countrywide, in accordance with

15   Countrywide's written closing instructions, and on closing documents prepared by

16   Countrywide.

17   57.   Between 2004 and 2008, Countrywide operated between 39 and 52 WLD branch

18   offices and several regional centers, and employed wholesale account executives

19   to work with mortgage brokers in originating loans, which included assisting the

20   brokers in setting the terms and conditions of loan applications and approvals.

21   58.   Mortgage brokers who supplied Countrywide with loan applications that

22   Countrywide funded were compensated in two ways.  One was through a yield

23   spread premium ("YSP"), an amount paid by Countrywide to the brokers based on

24   the extent to which the interest rate charged on a loan exceeded the base, or par,

25   rate for that loan to a borrower with particular credit risk characteristics fixed by

26   Countrywide and listed on its rate sheets.  The YSP is derived from the present

27   dollar value of the difference between the credit risk-determined par interest rate a

28   wholesale lender such as Countrywide would have accepted on a particular loan

1    and the interest rate a mortgage broker actually obtained for Countrywide.

2    Countrywide benefitted financially from the loans it made at interest rates above

3    the par rates set by its rate sheets.  For those loans that it sold or securitized, higher

4    interest rates meant sales at prices higher than it otherwise would have obtained;

5    for loans it retained, higher interest rates meant more interest income over time for

6    it.  The second way brokers were compensated was through direct fees.

7    Countrywide directed its closing agents to pay these direct fees to brokers out of

8    borrowers' funds at the loan closing.  Taken together, these two forms of

9    compensation are referred to in this Complaint as "total broker fees."

10   59.   During the time period at issue, Countrywide was fully informed of all broker fees

11         to be charged with respect to each individual residential loan application presented

12         to it.  The WBA required the broker to inform an applicant, inter alia, of all fees

13         and charges included with the application, including YSP and direct fees.  The

14         WBA further required the broker to submit an application package to Countrywide

15         that included, inter alia, a good-faith estimate of "all amounts Broker will charge

16         Applicant or earn in connection with the loan, including any applicable yield

17         spread premium."  Countrywide then included those fees in the calculations it

18         made to prepare various closing documents, including the HUD-1 Form, an

19         itemized statement of receipts and expenditures in connection with a residential

20         loan closing, and the Truth in Lending Act Disclosure Statement.  Countrywide

21         also included these fees in its instructions on how to distribute funds at closing.

22         Total broker fees raised the annual percentage rate ("APR") charged on a loan, and

23         could increase the note interest rate and the total amount borrowed.

24   60.   Between at least January 2004 and December 2008, Countrywide's policies and

25         practices established a two-step process for the pricing of wholesale loans that it

26         originated similar to that used in its retail division, as described in Paragraph 32.

27         The first step was to establish a base or par rate for a particular type of loan for an

28         applicant with specified credit risk characteristics.  In this step, Countrywide

1    accounted for numerous objective credit-related characteristics of applicants by

2    setting a variety of prices for each of the different loan products that reflected its

3    assessment of individual applicant creditworthiness, as well as the current market

4    rate of interest and the price it could obtain for the sale of such a loan from

5    investors.  These prices were communicated through the rate sheets described in

6    Paragraph 54.

7    61.    Countrywide's second step of pricing wholesale loans permitted mortgage brokers

8            to exercise subjective, unguided discretion in setting the amount of total broker

9            fees charged to individual borrowers, unrelated to an applicant's credit risk

10           characteristics.

11   62.    Countrywide had written policies placing a ceiling on total broker fees that

12           changed several times during the 2004-2008 time period.  For most of 2004,

13           Countrywide capped total broker compensation for prime loans at 5% of the loan

14           amount or $3000 and for subprime loans at 6% of the loan amount or $3500.  In

15           December 2004, Countrywide eliminated the dollar limitations and, through July

16           2007, followed a policy that instead capped total broker fees at 5% of the total

17           loan amount for prime loans and at 6% of the loan amount for what it described as

18           core subprime loans.  On a $200,000 loan, for example, these percentage caps

19           allowed brokers to receive up to $10,000 in total broker fees for a prime loan, and

20           $12,000 in total fees for a subprime loan.  Other than these caps, Countrywide did

21           not establish any objective criteria, or provide guidelines, instructions, or

22           procedures to be followed by brokers (a) in setting the amount of direct fees they

23           should charge or (b) in determining to charge an interest rate for a loan above that

24           set by its rate sheet, which in turn determined the amount of YSP Countrywide

25           would pay the broker.  Mortgage brokers exercised this fee pricing discretion

26           Countrywide gave them, untethered to any objective credit characteristics, on

27           every loan they brought to Countrywide for origination and funding.  Countrywide

28           affirmed or ratified these discretionary fee pricing decisions for all the brokered

- 23 -

1    loans it originated and funded.  Each year during this time period when

2    Countrywide had in place higher fee caps for subprime than prime loans,

3    Countrywide's mortgage brokers charged higher average total fees for subprime

4    loan applications than for non-subprime loan applications, measured on a

5    nationwide basis.

6  63.    For each residential loan application obtained by mortgage brokers and

7    subsequently funded by Countrywide, information about each borrower's race and

8    national origin and the amount and types of broker fees paid was available to, and

9    was known by, Countrywide.  Countrywide was required to collect, maintain, and

10    report data with respect to certain loan terms and borrower information for

11    residential loans, including the race and national origin of each wholesale

12    residential loan borrower, pursuant to HMDA, 12 U.S.C. § 2803.

13  64.    Statistical analyses of data kept by Countrywide on wholesale loans originated by

14    Countrywide between January 2004 and December 2008 demonstrate statistically

15    significant discriminatory pricing disparities in both subprime and non-subprime

16    wholesale loans based on both race (African-American) and national origin

17    (Hispanic).  These disparities existed both at the national level and in numerous

18    geographic markets across the country.

19  65.    Measured on a nationwide basis in each year between 2004 and 2008,

20    Countrywide charged Hispanic borrowers whom Countrywide determined had the

21    credit characteristics to qualify for a home mortgage loan more in total broker fees

22    for non-subprime wholesale loans than non-Hispanic White borrowers.  The

23    annual total broker fee disparities ranged between approximately 31 and 47 basis

24    points, and they are statistically significant.  During this period, Countrywide

25    originated more than 160,000 non-subprime wholesale loans to Hispanic

26    borrowers.

27  66.    Measured on a nationwide basis in each year between 2004 and 2008,

28    Countrywide charged African-American borrowers whom Countrywide

- 24 -

1   determined had the credit characteristics to qualify for a home mortgage loan more

2   in total broker fees for non-subprime wholesale loans than non-Hispanic White

3   borrowers.  The annual total broker fee disparities ranged between approximately

4   59 and 67 basis points, and they are statistically significant.  During this period,

5   Countrywide originated more than 65,000 non-subprime wholesale loans to

6   African-American borrowers.

7   67.   Measured on a nationwide basis in each year between 2004 and 2007,

8   Countrywide charged Hispanic borrowers whom Countrywide determined had the

9   credit characteristics to qualify for a home mortgage loan more in total broker fees

10   for subprime wholesale loans than non-Hispanic White borrowers.  The annual

11   total broker fee disparities ranged between approximately 12 and 19 basis points,

12   and they are statistically significant.[4]  During this period, Countrywide originated

13   more than 55,000 subprime wholesale loans to Hispanic borrowers.

14   68.   Measured on a nationwide basis in each year between 2004 and 2007,

15   Countrywide charged African-American borrowers whom Countrywide

16   determined had the credit characteristics to qualify for a home mortgage loan more

17   in total broker fees for subprime wholesale loans than non-Hispanic White

18   borrowers.  The annual total broker fee disparities ranged between approximately

19   36 and 49 basis points, and they are statistically significant.  During this period,

20   Countrywide originated more than 35,000 subprime wholesale loans to African-

21   American borrowers.

---

[4]   Due to the major changes in the housing market that began in the latter part of 2007, Countrywide made too few subprime wholesale loans in 2008 to permit statistical analysis of 2008 wholesale broker fees similar to that described in Paragraphs 67-68 for 2004-2007.

69.  In approximately 76% of its high non-subprime loan-volume markets in 2004 (81 of 106), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where Countrywide made more than 300 total non-subprime wholesale loans and 30 or more such loans to Hispanic borrowers in a given year, Countrywide charged Hispanic borrowers more in total broker fees not based on borrower risk for wholesale non-subprime loans than non-Hispanic White borrowers by a statistically significant amount. In 2005, approximately 83% of such markets (94 of 113); in 2006, approximately 77% of such markets (91 of 118); in 2007, approximately 82% of such markets (87 of 106); and in 2008, approximately 97% of such markets (33 of 34) showed statistically significant total broker fee disparities disfavoring Hispanic non-subprime wholesale borrowers. The disparities in total broker fees not based on borrower risk resulted in Hispanic borrowers in these markets paying between approximately 18 and 134 basis points more than non-Hispanic White borrowers for non-subprime wholesale loans in a given year. In all five years, there were no high loan-volume markets in which Countrywide charged non-Hispanic White borrowers statistically significantly higher total broker fees for non-subprime wholesale loans than Hispanic borrowers in a given year.

70.  In approximately 91% of its high non-subprime loan-volume markets in 2004 (71 of 78), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where Countrywide made more than 300 total non-subprime wholesale loans and 30 or more such loans to African-American borrowers in a given year, Countrywide charged African-American borrowers more in total broker fees not based on borrower risk for wholesale non-subprime loans than non-Hispanic White borrowers by a statistically significant amount. In 2005, approximately 85% of such markets (74 of 87); in 2006, approximately 84% of such markets (77 of 92); in 2007, approximately 87% of such markets (78 of 90); and in 2008, 90% of such markets (36 of 40) showed statistically significant total

broker fee disparities disfavoring African-American non-subprime wholesale borrowers. The disparities in total broker fees not based on borrower risk resulted in African-American borrowers in these markets paying between approximately 21 and 147 basis points more than non-Hispanic White borrowers for non-subprime wholesale loans in a given year. In all five years, there were no high loan-volume markets in which Countrywide charged non-Hispanic White borrowers statistically significantly higher total broker fees for non-subprime wholesale loans than African-American borrowers in a given year.

71. In approximately 84% of its high subprime-loan-volume markets in 2004 (27 of 32), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where Countrywide made more than 300 total subprime wholesale loans and 30 or more such loans to Hispanic borrowers in a given year, Countrywide charged Hispanic borrowers more in total broker fees not based on borrower risk for wholesale subprime loans than non-Hispanic White borrowers by a statistically significant amount. In 2005, approximately 61% of such markets (22 of 36); in 2006, approximately 49% of such markets in (17 of 35); and in 2007, 50% of such markets (7 of 14) showed statistically significant total broker fee disparities disfavoring Hispanic subprime wholesale borrowers. The disparities in total broker fees not based on borrower risk resulted in Hispanic borrowers in these markets paying between approximately 14 and 107 basis points more than non-Hispanic White borrowers for subprime wholesale loans in a given year. From 2004-2006, there were no high subprime-loan-volume markets in which Countrywide charged non-Hispanic White borrowers statistically significantly higher total broker fees for subprime wholesale loans than Hispanic borrowers in a given year; in 2007, there was one such market.

72. In approximately 74% of its high subprime-loan-volume markets in 2004 (23 of 31), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where Countrywide made more than 300 total subprime wholesale loans

1  and 30 or more such loans to African-American borrowers in a given year,

2  Countrywide charged African-American borrowers more in total broker fees not

3  based on borrower risk for wholesale subprime loans than non-Hispanic White

4  borrowers by a statistically significant amount.  In 2005, approximately 74% of

5  such markets (28 of 38); in 2006, approximately 68% of such markets (23 of 34);

6  and in 2007, approximately 58% of such markets (11 of 19) showed statistically

7  significant total broker fee disparities disfavoring African-American subprime

8  wholesale borrowers.  The disparities in total broker fees not based on borrower

9  risk resulted in African-American borrowers in these markets paying between

10  approximately 20 and 103 basis points more than non-Hispanic White borrowers

11  for subprime wholesale loans in a given year.  In all four years, there were no high

12  subprime-loan-volume markets in which Countrywide charged non-Hispanic

13  White borrowers statistically significantly higher total broker fees for subprime

14  wholesale loans than African-American borrowers in a given year.

15  73.   These disparities in total broker fees mean, for example, that Countrywide in 2007

16  charged a non-subprime wholesale customer in Los Angeles borrowing $200,000

17  an average of about $970 more in total broker fees not based on borrower risk if

18  she were Hispanic, and an average of about $1,195 more if she were African-

19  American, than the average amount charged to a non-Hispanic White non-

20  subprime wholesale customer.  Comparable average disparities in 2007 for

21  Hispanic and African-American non-subprime wholesale customers in Chicago

22  borrowing $200,000 were approximately $1,100 and $1,235, respectively, higher

23  than the average amount Countrywide charged a non-Hispanic White non-

24  subprime wholesale customer borrowing $200,000.

25  74.   Similarly, in 2006, Countrywide charged a subprime wholesale customer in

26  Chicago borrowing $200,000 an average of about $590 more in total broker fees

27  not based on borrower risk if she were Hispanic, and an average of about $740

28  more if she were African-American, than the average amount charged to a non-

Hispanic White subprime wholesale customer.  Comparable average disparities in 2006 for Hispanic and African-American subprime wholesale customers in Los Angles borrowing $200,000 were approximately $440 and $560, respectively, higher than the average amount Countrywide charged a non-Hispanic White subprime wholesale customer borrowing $200,000.

75.    In setting the terms and conditions for its wholesale loans, including interest rates, Countrywide accounted for individual borrowers' differences in credit risk characteristics by setting the prices shown on its rate sheets for each loan product that include its assessment of applicant creditworthiness, as explained in Paragraph 60.  Mortgage brokers' deviations from the rate sheet prices, as measured by total broker fees, were separate from and not controlled by the credit risk adjustments already reflected in the rate sheet prices.  Countrywide reviewed these total broker fees and then charged them to borrowers in the loans it originated and funded.  Accordingly, the race and national origin total broker fee disparities described in Paragraphs 65-72 are not adjusted for borrowers' credit risk characteristics.

76.    No Countrywide policy directed its mortgage brokers, or the Countrywide wholesale account executives who worked with them, to consider a borrower's credit risk characteristics for a second time in deviating from the interest rate fixed by its rate sheets for a specific loan product for a borrower with specified credit qualifications or in assessing direct fees.  Nevertheless, statistical regression analyses of the Countrywide total broker fees that control for credit risk factors such as credit score, loan amount, loan-to-value ratio, debt-to-income ratio, and others, demonstrate a similar pattern of race and national origin pricing disparities, with the magnitude only somewhat diminished from the disparities described in Paragraphs 65-72.  Thus, accounting for borrower credit risk factors a second time does not explain the race and national origin disparities, even if those factors were relevant to the total broker fees not based on borrower risk.

77.   The statistically significant race and national origin-based disparities in total broker fees described in Paragraphs 65-72 for Hispanics and African-Americans who Countrywide determined had the credit characteristics to qualify for a home mortgage loan resulted from the implementation and the interaction of Countrywide's policies and practices that: (a) included pricing terms based on the subjective and unguided discretion of brokers in setting total broker fees not based on borrower risk in the terms and conditions of loans Countrywide originated after par rates had been established by reference to credit risk characteristics; (b) did not require mortgage brokers to justify or document the reasons for the amount of total broker fees not based on borrower risk; (c) failed to adequately monitor for and fully remedy the effects of racial and ethnic disparities in those broker fees; and (d) created a financial incentive for brokers to charge interest rates above the par rates Countrywide had set.  Total broker fees specifically measures the pricing variation caused by the subjective and unguided pricing adjustments not based on borrower risk.  Countrywide continued to use these discretionary wholesale broker fee pricing policies, to inadequately document and review the implementation of that pricing component, and to incentivize upward broker adjustments to the par interest rate through the end of 2008.

78.   Countrywide's policies and practices identified in Paragraph 77 were not justified by business necessity or legitimate business interests.  There were less discriminatory alternatives available to Countrywide than these policies or practices.

79.   Countrywide had knowledge that the unguided and subjective discretion it granted to mortgage brokers in its wholesale pricing policies and practices was being exercised in a manner that discriminated against Hispanic and African-American borrowers, but continued to implement its policies and practices with that knowledge.  For example, an internal January 2006 Countrywide fair lending report stated that "WLD believes the current approach/policy is responsible" but

1    immediately afterward stated that "WLD is not confident that [its] remediation

2    activities will drive down disparity levels materially at the 'Top of House'"

3    (national level). It did not take effective action to change the broker fee policies

4    and practices to eliminate fully their discriminatory impact, nor did it substantially

5    alter its broker compensation policies and practices. Countrywide did not act to

6    identify or compensate any individual borrowers who were victims of its

7    discriminatory wholesale pricing policies and practices until it was required to do

8    so by its regulator in 2008, and it only identified or compensated a small number

9    of the victims.

10                        **Wholesale Lending Product Placement**

11   80.   Between 2004 and 2007, Countrywide placed more than 10,000 Hispanic and

12   African-American wholesale borrowers into subprime loans even though non-

13   Hispanic White wholesale borrowers who had similar credit qualifications were

14   placed into prime loans. As a result of being placed in a subprime loan, an

15   Hispanic or African-American borrower paid, on average, thousands of dollars

16   more for a Countrywide loan. It was Countrywide's business practice to allow its

17   mortgage brokers and employees to place a wholesale loan applicant in a subprime

18   loan even when the applicant qualified for a prime loan according to

19   Countrywide's underwriting practices. Countrywide also gave mortgage brokers

20   discretion to request exceptions to underwriting guidelines, and Countrywide's

21   employees had discretion to grant these exceptions. These policies and practices

22   resulted in the placement of Hispanic and African-American borrowers into

23   subprime loans, when similarly-situated non-Hispanic White borrowers were

24   placed into prime loans, both on a nationwide basis and in dozens of geographic

25   markets across the country where Countrywide originated a large volume of

26   wholesale loans.

27   81.   Countrywide's wholesale product placement monitoring efforts, while inadequate

28   to remedy discriminatory practices against Hispanic and African-American

- 31 -

borrowers through 2007, were sufficient to put it on notice of widespread product placement disparities based on race and national origin.  Even when Countrywide had reason to know there were disparities, however, Countrywide did not act to determine the full scope of these wholesale product placement disparities, nor did it take prompt and effective action to eliminate those disparities.  Between at least January 2004 and August 2007, Countrywide attempted to implement a system that would "flag" subprime loan applicants eligible to be "uplifted" to a non-subprime loan product.  This system flagged thousands of Hispanic and African-American loans.  However, this pre-origination "uplift" system only required that notification of potential uplift eligibility be given to brokers, and it neither required the brokers to inform applicants of this fact nor required the brokers to take any other specific action with respect to identified applicants.  Moreover, this "uplift" system did not accurately correspond to Countrywide's actual underwriting practices for non-subprime loan products that treated published underwriting guidelines as merely advisory and widely granted exceptions.  As a result, the system both failed to identify a large proportion of applicants who received a subprime loan whose qualifications were similar to those of applicants who received non-subprime loan products and resulted in few "flagged" applicants receiving a non-subprime loan.

82.    Between 2004 and 2007, Countrywide published underwriting guidelines that purported to establish the objective criteria an applicant had to meet in order to qualify for a particular type of loan product.  These underwriting guidelines were available to mortgage brokers who had entered into contracts with Countrywide to enable them to select loan products for individual borrowers with differing credit-related characteristics.  They also could be used by the wholesale account executives, underwriters, and others employed by Countrywide to determine whether to originate the applications brought to it by mortgage brokers.  These underwriting guidelines were intended to be used to determine whether a loan

applicant qualified for a prime loan product, an Alt-A loan product, a subprime
loan product, or for no Countrywide loan product at all.  A prime loan product has
loan terms and conditions, including prices, that generally are most favorable for a
borrower, an Alt-A loan product is less favorable, and a subprime loan product is
even less favorable and often included terms such as initial short-term teaser
interest rates that suddenly rise to produce substantially increased and potentially
unaffordable payments after two to three years, as well as substantial pre-payment
penalties.

83.  Mortgage brokers had discretion to request that applications they submitted be
treated as exceptions to Countrywide's underwriting guidelines.  Loan
underwriters or account executives employed by Countrywide, who determined
whether to originate the applications brought to it by mortgage brokers, had the
discretion to grant such exceptions.  Between January 2004 and early 2007,
Countrywide substantially increased the number of exceptions it granted to its loan
underwriting guidelines.  By early 2007, Countrywide originated as many as half
of certain loan products as exceptions to its underwriting policies.  As a result,
Countrywide made tens of thousands of non-subprime loans to borrowers between
2004 and 2007 based on criteria other than strict adherence to its published
underwriting guidelines.  Countrywide did not grant these exceptions to Hispanic
and African-American borrowers on a basis equal to that for non-Hispanic White
borrowers.  Countrywide provided no guidance to mortgage brokers about the
factors to consider in asking for exceptions and provided only very general, broad
guidance to its own employees about how to exercise discretion when granting
exceptions.  Individual loan applicants had no ability on their own to ask for an
exception directly from Countrywide's loan underwriting employees.

84.  Between January 2004 and July 2007, Countrywide's cap on the amount of total
compensation that a residential mortgage broker could receive on an individual
loan varied, in part, based on whether the loan was a subprime product or a non-

- 33 -

1   subprime product.  As described in Paragraph 62, although Countrywide changed

2   its broker compensation caps several times between December 2004 and July

3   2007, Countrywide's compensation policy allowed brokers to earn higher

4   maximum total compensation for submitting subprime loans to Countrywide for

5   origination than for non-subprime loans throughout this time period.

6   85.   Between 2004 and 2007, mortgage brokers who submitted loan applications

7   funded by Countrywide received higher total broker fees for subprime loans than

8   for non-subprime loans.  From 2005-2007, the average subprime loan had total

9   broker fees between approximately 26 and 53 basis points higher than the average

10   non-subprime loan, measured annually on a nationwide basis.  Countrywide's

11   compensation policy and practice created a financial incentive for mortgage

12   brokers to submit subprime loans to Countrywide for origination rather than any

13   other type of residential loan product.

14   86.   Statistical analyses of loan data kept by Countrywide on wholesale 30-year term

15   prime and subprime loans originated by Countrywide between January 2004 and

16   August 2007 demonstrate that on a nationwide basis Hispanics who qualified for a

17   Countrywide home mortgage loan and who obtained wholesale loans from

18   Countrywide had odds between approximately 2.6 and 3.5 times higher than

19   similarly-situated non-Hispanic White borrowers of receiving a subprime loan

20   instead of a prime loan, after accounting for objective credit qualifications.  Those

21   odds ratios demonstrate a pattern of statistically significant differences between

22   Hispanic and non-Hispanic White borrowers with respect to their placement by

23   Countrywide in one of these two loan product categories even after controlling for

24   objective credit qualifications such as credit score, loan amount, debt-to-income

25   ratio, loan-to-value ratio, and others.  These statistically significant disparities

26   existed both at the national level and in numerous geographic markets across the

27   country.

28

87. In approximately 59% of its high loan-volume markets in 2004 (24 of 41), defined for purposes of this paragraph as those MSAs and non-MSA areas in each state where during the year Countrywide made at least 300 total wholesale loans, including at least 30 subprime loans to both non-Hispanic White and Hispanic wholesale borrowers, Hispanic borrowers had odds of receiving subprime loans that are statistically significantly higher than non-Hispanic White borrowers ("statistically significant odds ratio disparities"). In 2005, approximately 54% (22 of 41) of such markets; in 2006 approximately 77% (33 of 43) of such markets; and in 2007 approximately 58% (11 of 19) of such markets had statistically significant odds ratio disparities disfavoring Hispanic borrowers. In individual high-volume markets with statistically significant odds ratio disparities, the odds of Hispanic borrowers receiving a subprime loan ranged from approximately 1.3 to 11.6 times higher than similarly-situated non-Hispanic White borrowers in a given year. In only one such market, and for only one year from 2004-2007, was there a statistically significant odds ratio disparity favoring Hispanic borrowers.

88. Statistical analyses of loan data kept by Countrywide on wholesale 30-year term prime and subprime loans originated by Countrywide between January 2004 and August 2007 demonstrate that on a nationwide basis African-Americans who qualified for a Countrywide home mortgage loan and who obtained wholesale loans from Countrywide had odds between approximately 2.1 and 2.7 times higher than similarly-situated non-Hispanic White borrowers of receiving a subprime loan instead of a prime loan after accounting for objective credit qualifications. Those odds ratios demonstrate a pattern of statistically significant differences between African-American and non-Hispanic White borrowers with respect to their placement by Countrywide in one of these two loan product categories even after controlling for objective credit qualifications such as credit score, loan amount, debt-to-income ratio, loan-to-value ratio, and others. These statistically

1   significant disparities existed both at the national level and in numerous
2   geographic markets across the country.
3   89.   In approximately 51% of its high loan-volume markets in 2004 (24 of 47), defined
4   for purposes of this paragraph as those MSAs and non-MSA areas in each state
5   where during the year Countrywide made at least 300 total wholesale loans,
6   including at least 30 subprime loans to both non-Hispanic White and African-
7   American wholesale borrowers, African-American borrowers had odds of
8   receiving subprime loans that are statistically significantly higher than non-
9   Hispanic White borrowers.  In 2005, approximately 52% (26 of 50) of such
10   markets; in 2006, approximately 61% (28 of 46) of such markets; and in 2007
11   approximately 71% (20 of 28) of such markets had statistically significant odds
12   ratio disparities disfavoring African-American borrowers.  In individual high-loan
13   volume markets with statistically significant odds ratio disparities, the odds of
14   African-American borrowers receiving a subprime loan ranged from
15   approximately 1.3 to 8.3 times higher than similarly-situated non-Hispanic White
16   borrowers in a given year.  In only one such market, and for only one year from
17   2004-2007, was there a statistically significant odds ratio disparity favoring
18   African-American borrowers.
19   90.   These odds ratio disparities mean, for example, that Countrywide in 2006 placed
20   more than 200 Hispanic and African-American wholesale borrowers in the
21   Chicago market into subprime loans when non-Hispanic White wholesale
22   borrowers in Chicago with similar credit risk characteristics received prime loans.
23   Each of these Hispanic and African-American borrowers would have paid
24   thousands of dollars in extra payments over the first four years of the loan's term
25   because they were placed into a subprime loan rather than a prime loan, based on
26   the average loan amount and the disparity between prime and subprime interest
27   rates for borrowers with similar credit risk characteristics in the Chicago market in
28   2006.  Similarly, Countrywide in 2006 placed more than 400 Hispanic and

1    African-American wholesale borrowers in the Los Angeles market into subprime

2    loans when non-Hispanic White wholesale borrowers in Los Angeles with similar

3    credit risk characteristics received prime loans.  Each of these Hispanic and

4    African-American borrowers would have paid thousands of dollars in extra

5    payments over the first four years of the loan's term because they were placed into

6    a subprime loan rather than a prime loan, based on the average loan amount and

7    the disparity between prime and subprime interest rates for borrowers with similar

8    credit risk characteristics in the Los Angeles market in 2006.

9    91.   Analyses of loan data to determine the odds of borrowers receiving non-subprime

10        loans (as defined in Paragraph 28) as opposed to subprime loans demonstrate

11        similar disparities.  Hispanic and African-American wholesale borrowers had

12        statistically significantly higher odds of receiving subprime loans from

13        Countrywide rather than non-subprime loans, as compared to similarly-situated

14        non-Hispanic White wholesale borrowers after taking into account objective credit

15        risk characteristics.  These race- and national origin-based disparities persisted at

16        both the nationwide level and in numerous high loan-volume MSAs during the

17        same years, 2004-2007.

18   92.   The disparate placement of both Hispanic and African-American wholesale

19        borrowers whom Countrywide determined had the credit characteristics to qualify

20        for a home mortgage loan into subprime loan products, when compared to

21        similarly-situated non-Hispanic White borrowers described in Paragraphs 86-89,

22        resulted from the implementation and interaction of Countrywide's policies and

23        practices that: (a) permitted mortgage brokers and Countrywide's own employees

24        to place an applicant in a subprime loan product even if the applicant could qualify

25        for a prime loan product; (b) did not require mortgage brokers or its employees to

26        justify or document the reasons for placing an applicant in a subprime loan

27        product even if the applicant could qualify for a prime loan product; (c) did not

28        require mortgage brokers to notify subprime loan applicants that they could

- 37 -

1    qualify for a prime loan product; (d) created a financial incentive for brokers to

2    place loan applicants in subprime loan products; (e) allowed brokers and

3    Countrywide loan officers and underwriters to request and to grant underwriting

4    exceptions in a subjective, unguided manner; and (f) failed to monitor these

5    discretionary practices to ensure that borrowers were being placed in loan products

6    on a nondiscriminatory basis.  Countrywide continued to use these product

7    placement, compensation, and discretionary underwriting policies until it exited

8    the subprime lending business after August 2007.

9    93.  Countrywide's policies or practices identified in Paragraph 92 were not justified

10    by business necessity or legitimate business interests.  There were less

11    discriminatory alternatives available to Countrywide than these policies or

12    practices.

13    94.  Countrywide had knowledge that its wholesale lending policies and practices

14    identified in Paragraph 92 encouraged the placement of applicants in subprime

15    rather than prime loan products and that its uplift system described in Paragraph

16    81 was ineffective, but continued to implement its policies and practices with that

17    knowledge.  For example, an internal Countrywide July 2007 report to its fair

18    lending committee discussed "significant errors due to operational failures" in its

19    uplift system.  Countrywide did not take effective action to change the

20    discriminatory policies or practices to eliminate their discriminatory impact.  It did

21    not act to identify or compensate any individual borrowers who were victims of its

22    discriminatory product placement policies or practices.

23    **Marital Status – Spousal Signature Policy**

24    95.  A married individual applying for credit has the choice of whether to apply solely

25    in his or her own name, rather than jointly with his or her spouse.  In an

26    application for a loan secured by real property by a married individual who

27    decides to apply solely in his or her own name, the creditor will have a security

28    interest in the entire property as long as the non-applicant spouse signs the legal

- 38 -

1   document (such as a mortgage or a deed of trust, depending on the state) granting

2   the lender the security interest.  The non-applicant spouse need not become

3   obligated to repay the loan from personal resources or to give up his or her

4   ownership interest in the property in order to give the creditor a security interest in

5   the entire property.

6   96.   Between 2004 and 2008, when a married individual decided to apply for a loan

7   solely in his or her own name, Countrywide's spousal signature policies or

8   practices encouraged its employees and agents to have the non-applicant spouse

9   execute documents that transferred to the applicant spouse all rights and interests

10   the non-applicant spouse had in the property securing the loan.  Countrywide

11   continued this spousal signature policy or practice at least through June 1, 2008.

12   97.   During the time period at issue, numerous non-borrower spouses executed

13   quitclaim deeds or other similar documents transferring their legal rights and

14   interests in jointly-held property to their borrower spouses as a condition of

15   Countrywide originating a loan to those borrower spouses.

16   98.   Section 701 of the ECOA, 15 U.S.C. § 1691(a), makes it "unlawful for any

17   creditor to discriminate against any applicant, with respect to any aspect of a credit

18   transaction – (1) on the basis of . . . marital status. . . ."  Regulation B, adopted

19   pursuant to explicit congressional direction, 15 U.S.C. § 1691b, provides that the

20   term "applicant" includes guarantors, sureties, endorsers, and similar parties

21   whose participation in the credit transaction is required in order to complete it.  12

22   C.F.R. § 202.2(e).  The policy or practice of having a non-borrower spouse

23   execute documents that transfer all legal rights and interests in jointly-held

24   property as a condition of originating a loan to the borrower spouse makes the

25   non-borrower spouse an applicant within the meaning of the ECOA, 15 U.S.C. §

26   1691a(b).

27   99.   The Official Staff Commentary to Regulation B ("OSC") is an official staff

28   interpretation of Regulation B.  The OSC states that "a creditor may require the

- 39 -

1    applicant's spouse to sign the instruments necessary to create a valid security

2    interest in the property" and nothing more if that "is sufficient to make the

3    property available to satisfy the debt in the event of default." 12 C.F.R. Supp I §

4    202.7 ¶7(d)(4)(2). The OSC further provides: "Generally, a signature to make the

5    secured property available will only be needed on a security agreement." Id.

6    Moreover, the OSC also states, in the context of unsecured credit: "A creditor may

7    not routinely require, however, that a joint owner sign an instrument (such as a

8    quitclaim deed) that would result in the forfeiture of the joint owner's interest in

9    the property." 12 C.F.R. Supp. I § 202.7 ¶7(d)(2)(1)(ii). That principle applies

10   equally to applications for secured credit.

11   100. A non-applicant spouse who executes a quitclaim deed or similar transfer

12   document as a result of Countrywide's policy and practices, unless on a voluntary

13   and fully-informed basis, risks substantial financial loss and uncertainty by

14   executing documents that transfer to the applicant spouse all rights and interests

15   the non-applicant spouse had in the property securing the loan.

16

17   **FAIR HOUSING ACT and EQUAL CREDIT OPPORTUNITY ACT**

18   **VIOLATIONS**

19   101. Countrywide's residential lending-related policies and practices and the policies

20   and practices it followed in residential credit transactions as alleged herein

21   constitute:

22      a.   Discrimination on the basis of race and national origin in making available,

23           or in the terms or conditions of, residential real estate-related transactions,

24           in violation of the FHA, 42 U.S.C. § 3605(a) (Complaint ¶¶ 29-94);

25      b.   Discrimination on the basis of race and national origin in the terms,

26           conditions, or privileges of sale of a dwelling, in violation of the FHA, 42

27           U.S.C. § 3604(b) (Complaint ¶¶ 29-94);

28

c.   Discrimination against applicants with respect to credit transactions on the basis of race and national origin, in violation of ECOA, 15 U.S.C. § 1691(a)(1) (Complaint ¶¶ 29-94); and

d.   Discrimination against applicants with respect to credit transactions on the basis of marital status, in violation of ECOA, 15 U.S.C. § 1691(a)(1), and Regulation B, 12 C.F.R. §§ 202.4(a) and 202.6(b)(8) (Complaint ¶¶ 95-100).

102.   Countrywide's residential lending-related policies and practices as alleged herein constitute:

a.   A pattern or practice of resistance to the full enjoyment of rights granted by the FHA, 42 U.S.C. §§ 3601-3619, and ECOA, 15 U.S.C. §§ 1691-1691f (Complaint ¶¶ 29-100); and

b.   A denial of rights granted by the FHA to groups of persons – both African-Americans and Hispanics – that raises an issue of general public importance (Complaint ¶¶ 29-94).

103.   Between 2004 and 2008, more than 200,000 persons throughout the nation have been victims of Countrywide's pattern or practice of discrimination and denial of rights as alleged herein.  In addition to higher direct economic costs, the victims of discrimination suffered additional consequential economic damages resulting from having an excessively costly loan, including possible prepayment penalties, increased risk of credit problems, default, and foreclosure, and other damages, including emotional distress.  They are aggrieved persons as defined in the FHA, 42 U.S.C. § 3602(i), and aggrieved applicants as defined in the ECOA, 15 U.S.C. § 1691e, and have suffered injury and damages as a result of Defendants' conduct. Attachment A depicts the states where these aggrieved persons described in Paragraphs 41-42, 69-72, 87, and 89 were located when the discrimination occurred.

104. Countrywide's policies and practices, as described herein, were intentional, willful, or implemented with reckless disregard for the rights of Hispanic and African-American borrowers and non-applicant spouses of married mortgage loan applicants.

## **RELIEF REQUESTED**

WHEREFORE, the United States prays that the Court enter an ORDER that:

(1)   Declares that the Defendants' challenged lending policies and practices constitute violations of the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f;

(2)   Enjoins the Defendants, their agents, employees, and successors, and all other persons in active concert or participation with any of the Defendants, from:

     (a)   Discriminating on the basis of race and national origin with respect to making available, or in the terms or conditions of, a residential real estate-related transaction;

     (b)   Discriminating on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling;

     (c)   Discriminating on the basis of race, national origin, and marital status against any person with respect to any aspect of a credit transaction;

     (d)   Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of the Defendants' unlawful conduct to the position they would have been in but for the discriminatory conduct; and

     (e)   Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any such discriminatory conduct in the future; to eliminate, to the extent practicable, the effects of the Defendants' unlawful practices; and to implement

- 42 -

policies and procedures to ensure that all borrowers have an equal
opportunity to seek and obtain loans on a non-discriminatory basis
and with non-discriminatory terms and conditions;

(3)   Awards monetary damages to the victims of the Defendants' discriminatory
policies and practices for the injuries caused by the Defendants, including direct
economic costs, consequential economic damages, and other damages, pursuant to
42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. § 1691e(h); and

(4)   Assesses a civil penalty against the Defendants in an amount authorized by 42
U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

ERIC H. HOLDER, JR.
Attorney General

ANDRÉ BIROTTE JR.
United States Attorney

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

LEON W. WEIDMAN
Chief, Civil Division

STEVEN H. ROSENBAUM
Chief
Housing and Civil Enforcement Section

DONNA M. MURPHY
Principal Deputy Chief

SEKRET SNEED
Assistant United States Attorney
Email: Sekret.Sneed@usdoj.gov
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, CA 90012
Tel: (213) 894-3551
Fax: (213) 894- 7819

PATRICIA L. O'BEIRNE
E-mail: Patricia.O'Beirne@usdoj.gov

BURTIS M. DOUGHERTY
E-mail: Burtis.M.Dougherty@usdoj.gov

DANIEL P. MOSTELLER
E-mail: Daniel.Mosteller@usdoj.gov
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - G St.
Washington, D.C.  20530
Tel: (202) 514-4713
Fax: (202) 514-1116



Attachment A

Jurisdictions With Substantial Concentrations of Aggrieved Persons (41 States and the District of Columbia)

Prepared by:
U.S. Department of Justice
Civil Rights Division
Washington, D.C. 20530

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

**CV11- 10540 PSG (AJWx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

ORIGINAL

Patricia L. O'Beirne
U.S. Department of Justice
Civil Rights Division
Housing and Civil Enforcement Section - G Street
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER |
| v.                                             PLAINTIFF(S) | CV11 10540-PSG (AJWk) |
| COUNTRYWIDE FINANCIAL CORPORATION<br>COUNTRYWIDE HOME LOANS, INC.; and<br>COUNTRYWIDE BANK | SUMMONS |
| DEFENDANT(S). | |

TO:    DEFENDANT(S): COUNTRYWIDE FINANCIAL CORP; COUNTRYWIDE HOME LOANS, INC. and COUNTRYWIDE BANK

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Patricia L. O'Beirne_____, whose address is _U.S. Dept of Justice, Civil Rights Division, Housing & Civil Enforcement--G St, 950 Pennsylvania Ave NW, Washington, DC 20530_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __DEC 2 1 2011_____

By: _____
                Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

United States of America

**DEFENDANTS**

Countrywide Financial Corporation, Countrywide Home Loans, Inc., and Countrywide Bank

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Patricia O'Beirne
US Dept of Justice, Civil Rights Division, Housing & Civil Enforcement - G St
950 Pennsylvania Ave NW, Washington, DC 20530   202-307-6264

**Attorneys (If Known)**

Melanie Brody
K&L Gates LLP
1601 K Street, NW
Washington, DC 20006   202-778-9000

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in this State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 USC 1691 et seq.and 42 USC 3601 et seq - Race, national origin, and marital status discrimination in home mortgage lending

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☒ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

CV11 10540

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
  ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☑  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):** _P Beirne_   Date  12/21/11

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CV-71 (05/08)                        CIVIL COVER SHEET                        Page 2 of 2